**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

JERRY DEAN PAYNE, JR.,          )
                                 )
          Plaintiff,       )
                                 )
v.                            )       Case No. 14-CV-39-GKF-TLW
                                 )
JEREMY MYERS, et al.,         )
                                 )
          Defendants.     )

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment of defendant City of Miami, Oklahoma ("City of Miami" or "the City") [Dkt. #121], the Motion for Summary Judgment of defendant Jeremy Myers [Dkt. #122], the Motion for Summary Judgment of defendant Teresa Lashmet [Dkt. #127], and the Motion for Summary Judgment of defendants Kenny McKee and the Department of Public Safety ("DPS") [Dkt. #128].

This case arises from traffic stop that took place in Miami, Oklahoma, on May 14, 2013, during which the plaintiff, Jerry Dean Payne Jr., was forcibly removed from his truck and arrested. In January 2014, Payne brought this action against the three arresting officers, defendants Myers, Lashmet, and McKee, as well as their employers, defendants DPS and the City of Miami, alleging various civil rights violations. The defendants now move for summary judgment on all twenty-eight (28) claims contained in the nine (9) causes of action contained in the Second Amended Complaint.

# I.     BACKGROUND

In the early morning hours of May 14, 2013, Oklahoma Highway Patrol Trooper Kenny McKee and Miami Police Officers Teresa Lashmet and Jeremy Myers were on-duty, standing outside a Love's convenience store on Steve Owens Boulevard in Miami, Oklahoma.  At approximately 2:00 a.m., the officers observed a pickup truck driven by Payne traveling westbound on Steve Owens Boulevard.  The three officers all visually estimated that Payne was traveling in excess of the posted speed limit of 35 miles per hour.  [Dkt. #128-1, p. 2; Dkt. #122-4, p. 2; Dkt. #122-6, p. 4; Dkt. #122-7, p. 2].  According to Officer Myers and Trooper McKee, Payne appeared to be traveling approximately 45 to 50 miles per hour.  [Dkt. #128-1, p. 2; Dkt. #122-4, p. 2; Dkt. #122-6].  All three officers also observed Payne drive onto the curb while making a left turn onto H Street.  [Dkt. #128-1, p. 3; Dkt. #122-4, p. 2–3; Dkt. #122-6, p. 7; Dkt. #122-7, p. 2].

The three officers, each in separate patrol vehicles, immediately pursued Payne.  Trooper McKee was in the lead, followed by Officer Lashmet and then Officer Myers.  [Dkt. #127-3, p. 5].  The events which follow were recorded on a dash-mounted video camera in Trooper McKee's patrol vehicle.  [*See* Dkt. #121-5].  After turning onto H Street, Trooper McKee activated his siren and emergency lights to initiate a stop.  By that time, Payne was several hundred yards ahead of the officers and preparing to turn into The Stables Casino.  Trooper McKee pulled up behind Payne just as he turned into the casino's parking lot.  After momentarily stopping in the middle of the lot, Payne slowly pulled forward into a parking spot adjacent to H Street.  As he did so, Trooper McKee shouted at Payne to stop.  Payne immediately complied.  After stopping his vehicle, Payne opened the driver-side door and, while remaining seated, held his hands in the air.

Officer Lashmet and Trooper McKee approached Payne with their guns drawn and held in a low-ready position. While approaching the vehicle, Trooper McKee told Payne to keep his hands where they could be seen but did not otherwise order Payne to exit his vehicle. Upon reaching the vehicle, Trooper McKee holstered his weapon, grabbed Payne by his left arm, and pulled him from the vehicle onto the ground. Trooper McKee guided Payne to the ground while holding him by his left arm and behind his neck. Payne initially went to his knees while holding himself up with his right arm. Trooper McKee then ordered Payne to get on the ground and pushed Payne's head downward from behind the neck. Payne complied with the order and went to the ground on his right side. At that point, Officer Lashmet and Trooper McKee began pushing Payne to roll onto his stomach, which he did after Trooper McKee ordered him to "roll over."

During this time, Officer Myers had arrived on the scene and parked his vehicle on the other side of Payne's truck, approximately 100 feet from the scene. He ran towards the scene just as Trooper McKee and Officer Lashmet were working to roll Payne forward onto his stomach. Just as Payne rolled over, Officer Myers ran around the back end of the truck. Payne was on his stomach, but his face was inclined slightly upward. Officer Myers's right leg struck Payne's face, causing Payne's head and neck to snap back. Officer Myers then fell onto Payne's back and assisted Trooper McKee in handcuffing Payne. Approximately thirty seconds elapsed from the time Trooper McKee extracted Payne from the vehicle until the time he was handcuffed. As a result of the arrest, Payne suffered bruising and lacerations to his face, bruised ribs, a chipped tooth, and a cracked bridge. [Dkt. #147-1 p. 7–8].

After he was handcuffed, Officer Lashmet learned that Payne had a suspended license and an outstanding arrest warrant. [Dkt. #127-5, p. 1]. Payne was booked at the Ottawa County

Jail on charges of driving under the influence, obstructing an officer, driving on a suspended

license, and failure to appear for a warrant. [*Id.* at 1–2]. Officer Lashmet later submitted a

probable cause affidavit for Payne's arrest, which described the events of that night as follows:

> On Tuesday, May 14, 2013 at approximately 0200 hours while on patrol I observed a vehicle traveling westbound on Steve Owens Blvd at a high rate of speed. The vehicle then attempted to turn south on "H" Street Southeast and left the roadway. The vehicle then swerved back onto the roadway and continued southbound on "H" Street Southeast. I then activated my emergency equipment and conducted a traffic stop on the said vehicle in the Stables parking lot. The said vehicle is described as a black in color 2004 Ford F150 pickup truck bearing Oklahoma License Plate 152HCK.
> The driver immediately got out of his truck. After multiple orders for him to remain in his vehicle the driver, Jerry Dean Payne Jr sat back inside his truck while yelling, "what the fuck did I do". As I approached the vehicle I observed that Payne's hands were empty, I then ordered Payne to slowly get out of his truck. Payne remained seated telling me that I had just ordered him back in his truck. I again asked Payne to step out of the truck and he refused.
> While talking with Payne I observed the following signs of intoxication, slurred speech, the odor usually associated with the smell of an alcoholic beverage coming from his breath, unsteady on his feet, and red bloodshot eyes.
> Trooper Kenny McKee arrived on the scene. Due to Payne refusing to exit his truck, McKee then pulled Payne from the truck and we placed him on the ground using a straight arm bar technique. Mckee secured his left arm and I ordered Payne to roll to his stomach and give me his arm. Payne refused to roll onto his stomach and give me his right arm. I gave the command again to roll onto his stomach and give me his right arm. Payne again refused. I attempted to pull his right arm out from underneath him and turn him onto his stomach. Officer Myers then arrived on scene and assisted me in getting control of Payne. Officer Myers then secured Payne in handcuffs. I helped Payne into a sitting, kneeling, standing position and placed him in my patrol car.

[*Id.* at 1].

On May 17, 2013, Payne was charged in Ottawa County District Court with driving a

motor vehicle under the influence of alcohol, obstructing an officer, and driving with a

suspended licence. [Dkt. #127-9, p. 1]. In October 2013, the State moved to dismiss all charges

against Payne without prejudice; the court granted the motion. Ottawa County Assistant District

Attorney Jennifer Ellis ("ADA Ellis") later testified that she decided to dismiss the charges

against Payne after reviewing the video of the stop. [Deposition of Jennifer Ellis-McAffrey, Dkt.

#148-4, p. 7]. When asked what specifically about the video led her to do so, ADA Ellis stated,

> When I reviewed the video, it was wholly and entirely different than any reports I
> had received about this arrest, about the allegations, about the conduct of
> Mr. Payne that led to his arrest. Not only was I surprised by the differences in the
> video versus the reports, but I couldn't articulate from reviewing the footage what
> crimes I would even choose to proceed against Mr. Payne on at that point. So I
> really felt like there was no proper basis to continue to prosecute Mr. Payne based
> on that video in conjunction with the affidavits.

[*Id.* at 7–8].

When asked to recall specific discrepancies between the video and Officer Lashent's

affidavit, ADA Ellis pointed to Payne's conduct during his arrest:

> So from the get go, I was concerned that my probable cause affidavit that I
> had relied on was not correct. And then as the video goes on and you see the
> conduct of Mr. Payne, from my interpretation of the video, he seemed
> cooperative, compliant. There was nothing about his conduct that made me
> instantly concerned that he was under the influence or that he was combative with
> officers and a reading of the PC affidavit was very, very different.
>     It articulates that he is essentially out of control and in that that—it
> gives—it gives one the impression that Teresa Lashmet had to call for backup
> because of this person being so combative and unruly, but I didn't see any of that
> in the video.

[*Id.* at 8–9].

After reviewing the video, ADA Ellis spoke with Officer Lashmet about the inaccuracies

in her affidavit. During their conversation, Officer Lashmet stated that she "only wrote what her

supervisor told her to write." [*Id.* at 12: 6–9]. She also told ADA Ellis that she had stopped

working the night shift because she was "tired of all the violence that occurs on every traffic

stop" and that she had once seen an officer "punch him [a suspect] to the point where he couldn't

breathe." [Ellis Memorandum, Dkt. #148-10].[1]

---

[1] The court includes this sentence for background purposes only. For reasons set forth below,
the court does not consider ADA Ellis's memorandum for purposes of summary judgment.

On October 17, 2013, Miami Police Detectives David Dean and Mark Byfield spoke with Assistant District Attorney Benjamin Loring ("ADA Loring") about concerns they had regarding behavior within the department. Specifically, the detectives "expressed great concern about what was happening at Miami PD, particularly on the midnight shift, insofar as violation of rights and excessive use of force." [Dkt. #147-18, p. 4–5]. They stated that "there had been 17 internal investigations at Miami PD over those types of issues," that "inappropriate things [had] been happening on [the midnight] shift for over ten years," and that, in their opinions, the department's internal "investigations were not thorough and were more of a cover-up than a real investigation." [*Id.* at 6–9]. They also told ADA Loring that "there was weak and inappropriate supervision on that shift and that, in their opinions, the supervisors were as guilty of using excessive force as anyone else." [*Id.* at 10–11]. Finally, the detectives stated that "because nothing happen[ed] to the violating officers, the general mood of the midnight shift [was] that everyone might as well go along with [the] inappropriate behavior as it [had] become the norm." [*Id.* at 12; Dkt. #147-17, p. 1]. ADA Loring recorded the detectives' statements in a memorandum dated October 22, 2013. [Dkt. #147-17].

At the time of Payne's arrest, Officer Myers was a certified peace officer in the State of Oklahoma, having successfully completed the Oklahoma Council on Law Enforcement Education and Training ("CLEET") Academy. According to Chief Haralson, this instruction included "training on the use of force in conducting arrests." [Dkt. #147-10, p. 34]. It is unclear from the record whether such training involved instruction on avoiding the use of excessive force. Detective Dean testified that he did not receive any specific training on what constitutes excessive force. [Dkt. #147-19, p. 3].

## II.      STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"This court reviews summary judgments based on qualified immunity differently than other summary judgments. When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and

(2) the constitutional right was clearly established." *Becker v. Bateman*, 709 F.3d 1019, 1022

(10th Cir. 2013) (internal quotation marks omitted). "Only if the plaintiff has satisfied both steps

is qualified immunity defeated." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012). "For a

constitutional right to be clearly established, the contours of the right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right."

*Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (internal quotation marks

omitted).

## III.    DISCUSSION

The defendants have moved for summary judgment as to all claims alleged in the Second

Amended Complaint. In response to the defendants' motions, Payne has explicitly abandoned a

number of his claims.[2] His remaining claims now consist of the following:

- <u>Count I:</u> an excessive force claim under 42 U.S.C. § 1983 against Trooper McKee and Officer Myers;
- <u>Count II:</u> a wrongful arrest claim under 42 U.S.C § 1983 against Trooper McKee and Officer Lashmet;
- <u>Count III:</u> a malicious prosecution claim under 42 U.S.C § 1983 against Officer Lashmet;
- <u>Count IV:</u> a § 1983 municipal liability claim against the City of Miami alleging a custom or policy of (i) excessive force, (ii) wrongful detention and arrest, and (iii) submission of false police and incident reports to cause charges to be filed;
- <u>Count V:</u> a § 1983 municipal liability claim against the City of Miami for a policy of inadequate training, supervision, and discipline;
- <u>Count VI:</u> a state law assault and battery claim against Officer Myers, Trooper McKee, the City of Miami, and the Department of Public Safety.

---

[2] In particular, Payne has abandoned the following claims: (1) his wrongful arrest (Count II), malicious prosecution (Count III), and false imprisonment (Count VIII) claims against Officer Myers, [Dkt. #149, p. 21-22]; (2) his malicious prosecution (Count III) and false imprisonment (Count VIII) claims against Trooper McKee, [Dkt. #150, p. 20, 23]; and (3) his excessive force (Count I), assault and battery (Count VI), and false imprisonment (Count VIII) claims against Officer Lashmet, [Dkt. #148, p. 21]. To date, Payne has not moved to voluntarily dismiss these claims. The court, therefore, grants the defendants' motions for summary judgment with regard to these abandoned claims.

- **Count VII:** a state law intentional infliction of emotional distress claim against all defendants;
- **Count VIII:** a state law false imprisonment claim against the City of Miami and the Department of Public Safety;
- **Count IX:** a state law negligence claim against the City of Miami and the Department of Public Safety.

The court considers these claims in turn.

### A. *Excessive Force*

Payne contends that Trooper McKee and Officer Myers used excessive force during the course of his arrest. Such claims are "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Under this standard, 'the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Morris*, 672 F.3d at 1195 (*quoting Graham*, 490 U.S. at 397). "Factors to consider include, but are not limited to, '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1249 (10th Cir. 2013) (alterations in original) (*quoting Graham*, 490 U.S. at 396). In undertaking this analysis, the court must proceed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking account of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97.

### 1. Trooper McKee

Starting with Trooper McKee, Payne contends that the trooper used excessive force when he pulled Payne from his vehicle and onto the ground.[3] Under the first *Graham* factor, Trooper McKee asserts that prior to his use of force he had probable cause and/or reasonable suspicion to believe that Payne (1) was driving recklessly in violation of Okla. Stat. tit. 47, § 11-901(A), (2) was speeding in violation of Okla. Stat. tit. 47, § 11-801, (3) had left the roadway in violation of Okla. Stat. tit. 47, § 11-309(1), and (4) was driving under the influence of alcohol in violation of Okla. Stat. tit. 47, § 11-902.[4] Although these offenses, particularly drunk driving, are by no means insignificant, Oklahoma law treats them as misdemeanors, Okla. Stat. tit. 47, §§ 11-102, 11-902(C),[5] "and the amount of force used should be reduced accordingly," *Morris*, 672 F.3d at 1195 (alteration omitted) (internal quotation marks omitted). This factor thus weighs in Payne's favor.

The second factor also indicates that Trooper McKee's use of force was excessive. Payne was suspected of committing nonviolent traffic offenses. He did not directly threaten any of the officers, nor did he assume a threating posture during the course of the arrest. Rather, he

---

[3] Payne also contends that Trooper McKee smashed or pushed his head into the concrete. The video of the arrest belies this assertion. Although the video shows Trooper McKee at one point pushing downward on Payne's head, there is no indication that Trooper McKee ever caused Payne's head to make contact with the concrete. [*See* Dkt. 128-2, 1:59]. Because Payne offers no other evidence to substantiate this allegation, a reasonable jury could not find that the trooper smashed or pushed Payne's head into the concrete.

[4] "[I]n an excessive force inquiry, [the court] asks whether the force used would have been reasonably necessary *if the arrest or the detention were warranted.*" *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (emphasis in original) (internal quotation marks omitted). Thus, although it is not entirely clear that the officers had probable to arrest Payne for all of these offenses, the court will "[a]ssum[e] for the purposes of [its] independent excessive force analysis that [Payne] had indeed committed" the crimes at issue. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008).

[5] In Oklahoma, driving under the influence is classified a misdemeanor for the first offence. Okla. Stat. tit. 47, § 11-902(C)(1). Depending on the circumstances, a subsequent offense may qualify as a felony. *See id.* § 11-902(C)(2).

stopped his vehicle and raised his hands in the air. On these facts, Payne posed little immediate threat to the safety of the officers or others.[6]

Finally, under the third *Graham* factor, Payne did not actively resist arrest or attempt to flee. Before being forcibly removed from his vehicle, Payne had complied with all of the officers' orders. He had stopped his vehicle and had held his hands in a visible position. Further, once taken to the ground, Payne quickly complied with Trooper McKee's orders to "get on the ground" and to "roll over."[7] Based on the foregoing factors, the court concludes that a reasonable jury could find that the force used by Trooper McKee in arresting Payne was objectively unreasonable, and thus excessive, given that Payne was cooperative, nonviolent, and not suspected of any crime other than misdemeanor traffic offenses. *See id.* at 1195-96 (holding that an officer's "forceful takedown" or "throw down" of a nonviolent misdemeanant who did not flee or actively resist arrest constituted excessive force under the Fourth Amendment); *Becker*, 709 F.3d at 1025–26 (concluding that a reasonable jury could find that an officer's act of

---

[6] Trooper McKee contends that Payne was intoxicated at the time of his arrest and thus was unpredictable and possibly dangerous. Specifically, Trooper McKee testified that upon approaching Payne's truck he could smell the odor of alcohol and could see that Payne's eyes were bloodshot and glassy. For his part, Payne submits that Trooper McKee did not have enough time to observe any such signs of intoxication before forcibly removing him from his vehicle and thus that his alleged intoxication should not factor into the court's excessive force inquiry.

　　After viewing the video, the court agrees that a genuine issue of fact exists as to whether Trooper McKee actually observed Payne exhibiting signs of intoxication before the trooper removed him from his vehicle. [*See* Dkt. #128-2, 1:50]. Further, even if Trooper McKee did reasonably believe that Payne was intoxicated, the fact that an individual is intoxicated does not necessarily mean that he or she poses a threat to officer or bystander safety. *See Morris*, 672 F.3d at 1196 (concluding that a large, intoxicated man who had approached a group of officers and a bystander and asked the bystander a potentially confrontational question "posed little immediate to the safety of the officers or [the bystander]").

[7] Although the video at one point shows Trooper McKee pushing Payne to roll forward onto his stomach, a reasonable jury certainly could conclude that Payne was not resisting arrest, but rather was confused as to what was expected of him. At the time he started pushing Payne to roll forward, Trooper McKee had not ordered Payne to roll over; as soon as he did, Payne complied.

"thr[owing the plaintiff] to the ground" was objectively unreasonable, and thus excessive, where all three *Graham* factors indicated that force was not justified); *Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007) (determining that a reasonable jury could find that an officer's use of a "twist-lock maneuver" for officer safety purposes was unreasonable where the plaintiff, although intoxicated, was cooperative, nonviolent, and not suspected of any crime).

Invoking qualified immunity, Trooper McKee nonetheless contends that his conduct did not violate any clearly established law. In determining whether an officer's use of force violates clearly established law, the Tenth Circuit has adopted a sliding scale approach:

> "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 511 (10th Cir. 2011). Because the existence of excessive force is a fact-specific inquiry, however, "there will almost never be a previously published opinion involving exactly the same circumstances." *Casey*, 509 F.3d at 1284. Thus, we have adopted a sliding scale: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

*Morris*, 672 F.3d at 1196; *accord Aldaba v. Pickens*, 777 F.3d 1148, 1159 (10th Cir. 2015). Under this approach, an officer's use of force violates clearly established law, "even in the absence of similar prior cases, if the force is clearly unjustified based on the *Graham* factors." *Morris*, 672 F.3d at 1197–98; *accord Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("[W]hen an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law."). "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Morris*, 672 F.3d at 1198 (*quoting Casey*, 509 F.3d at 1285). Here, as discussed above, all three *Graham* factors weigh against Trooper McKee's use

of force.  Under these circumstances, "a reasonable officer would know based on his training that the force used was not justified." *Id.* (holding that an officer's forceful takedown of the plaintiff—a large, intoxicated man—violated clearly established law given that the plaintiff did not pose an immediate threat to those around him, was not resisting arrest or attempting to flee, and was suspected of, at most, misdemeanor assault).[8]  Trooper McKee thus is not entitled to qualified immunity on Payne's excessive force claim.

### 2.  Officer Myers

Payne alleges that Officer Myers intentionally kicked him in the face while he was lying defenseless on the concrete.  Officer Myers does not dispute that his leg made contact with Payne's face, nor does he defend his actions in this regard as a legitimate use of force.  Rather, Officer Myers contends the contact between his leg and Payne's face was purely accidental and thus not actionable under § 1983.  While it is certainly true that "liability under § 1983 must be predicated upon a *deliberate* deprivation of constitutional rights by the defendant, and not on negligence," *Darr v. Town of Telluride*, 495 F.3d 1243, 1256 (10th Cir. 2007) (alteration omitted) (internal quotation marks omitted), here a reasonable jury could find that Officer Myers intentionally kicked Payne in the face.  Because this disputed issue of fact is material both on the

---

[8] Trooper McKee maintains that he is entitled to qualified immunity under *Becker v. Bateman,* 709 F.3d 1019 (10th Cir. 2013), which, he contends, recognizes that there was no clearly established law at the time of Payne's arrest as to the appropriate level of force that can be used to arrest a potentially intoxicated person during a traffic stop.  This argument misses the mark. *Becker* merely noted that "there was no clearly established law *as of 2007* regarding the appropriate level of force which may be used to arrest a potentially intoxicated person during a stop." *Id.* at 1023 (emphasis added).  Since 2007, the Tenth Circuit has held, on at least two occasions, that a police officer's forceful takedown of a nonviolent misdemeanant who, although intoxicated, did not flee or actively resist arrest constitutes excessive force under the Fourth Amendment.  *See Morris*, 672 F.3d at 1196; *Becker*, 709 F.3d at 1025–26; *see also Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007) (determining that a reasonable jury could find that an officer's use of a "twist-lock maneuver" for officer safety purposes was unreasonable where the plaintiff, although intoxicated, was cooperative, nonviolent, and not suspected of any crime).

merits as well as qualified immunity, *see Morris*, 672 F.3d at 1198, Officer Myers is not entitled to summary judgment on Payne's excessive force claim.[9]

### B.  Wrongful Arrest

Payne next contends that at the time of his arrest Trooper McKee and Officer Lashmet lacked probable cause to believe that he had committed any crime.  "An arrest, for purposes of the Fourth Amendment, is a seizure, which occurs only when, by means of physical force or a show of authority, an individual's freedom of movement is restrained." *Romero v. Story*, 672 F.3d 880, 885 (10th Cir. 2012) (alteration omitted) (internal quotation marks omitted).  "A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (internal quotation marks omitted).  This is true even if the crime at issue is a minor traffic offense. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Cortez*, 478 F.3d. at 1116 (internal quotation marks omitted).  In undertaking this analysis, an officer's subjective reason for making an arrest is irrelevant. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  Rather, an arrest is lawful so long as the officer had probable cause to believe that a crime—any crime—had occurred. *See id.* at 153-55 ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for

---

[9]  For this same reason, Officer Myers's motion for summary judgment on Payne's claim for punitive damages is denied.

the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (internal quotation marks omitted)).

Here, it is uncontested that Trooper McKee and Officer Lashmet arrested Payne without a warrant. The defendants nonetheless maintain that they had probable cause to arrest Payne for speeding, reckless driving, leaving the roadway, and driving under the influence of alcohol, all of which are misdemeanors. According to his affidavit, on the night in question, Trooper McKee visually estimated that Payne was traveling somewhere between ten to fifteen miles per hour over the speed limit. Officer Myers similarly testified that he believed Payne was speeding. Payne has offered no evidence to dispute these assertions.[10] "It's long been the case that an officer's visual estimation can supply probable cause to support a traffic stop for speeding in appropriate circumstances." *United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011). Here, the record shows that Officer Myers and Trooper McKee have experience and have undergone training on how to visually estimate a vehicle's speed. [Dkt. #128-1, p. 11; Dkt. #122-6, p. 4–5]. Payne has offered no reason to question the officers' estimates. The court, therefore, concludes that Trooper McKee and Officer Lashmet had probable cause to believe that, prior to his arrest, Payne was speeding in violation of Okla. Stat. tit. 47, § 11-801, and thus that his arrest was lawful. Further, even if probable cause here was lacking, "a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff" for speeding. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Thus, the defendants are also entitled to summary judgment based on qualified immunity as to Payne's wrongful arrest claim. *Id.*

---

[10] During his deposition, Payne testified that he could not recall whether he was speeding or what the speed limit was for the area in question. [Dkt. #128-3, p. 13, 28].

### C.  Malicious Prosecution

The court next considers Payne's malicious prosecution claim against Officer Lashmet. A § 1983 malicious prosecution claim consists of the following elements:  "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Here, Payne contends that Officer Lashmet intentionally falsified portions of her probable cause affidavit thereby causing his continued confinement and prosecution in the absence of probable cause.  Following his arrest, the State charged Payne with driving under the influence, obstructing an officer, and driving with a suspended licence.  Officer Lashmet maintains that there was probable cause to charge Payne with driving on a suspended license and thus that his claim of malicious prosecution must fail.  Payne does not dispute that was driving on a suspended license but nonetheless asserts that he can pursue a malicious prosecution claim based on the other charges brought against him.[11]

Whether a § 1983 plaintiff can maintain a malicious prosecution claim on a charge-by-charge basis raises a close question of law, which the Tenth Circuit has yet to definitively address.  *See Van De Weghe v. Chambers*, 569 Fed. App'x 617, 619–20 (10th Cir. 2014).  This court need not resolve the issue here.  Because there is currently no "clearly established law [in

---

[11]  Payne also asserts that his driving on a suspended license is irrelevant to his malicious prosecution claim given that Officer Lashmet did not learn of that fact until after his arrest.  This argument is unpersuasive.  To prevail on a malicious prosecution claim, a plaintiff must show that "there was no probable cause to support [his] original arrest, continued confinement, or prosecution." *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011).  Here, there is no dispute that probable cause existed to support Payne's confinement and prosecution for driving on a suspended license.  That such probable cause did not arise until after Payne's initial arrest is irrelevant for purposes of his malicious prosecution claim.

this circuit] suggesting that a claim for malicious prosecution lies when one charge is supported by probable cause but other simultaneous charges arising from the same set of facts are not," Officer Lashmet is entitled to qualified immunity, and thus summary judgment, on Payne's malicious prosecution claim.  *See id.*

### D.  Section 1983 Municipal Liability Claims

The court next considers Payne's § 1983 claims against the City of Miami. "A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).  Rather, to prevail on a § 1983 municipal liability claim, a plaintiff must show (1) the existence of a municipal policy or custom, (2) a direct causal link between the policy or custom and the constitutional injury alleged, and (3) "that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir. 2014).  A municipal policy or custom may take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (alterations omitted) (internal quotation marks omitted).  To establish deliberate indifference, a plaintiff must show that

> the municipality ha[d] actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and [that] it consciously or deliberately cho[se] to disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 (10th Cir. 2013).

Here, Payne contends that his injury was the direct result of a custom of excessive force within the Miami Police Department, to which the City was deliberately indifferent. In particular, he asserts that the use of excessive force was a custom within the Miami Police Department based on (1) the widespread use of such force by officers within the department, and (2) the City's failure to adequately train its officers on the proper use of force.[12] In making this claim, Payne relies principally on the following evidence:

- Statement by Detectives Dean and Byfield to ADA Loring about the widespread use of excessive force within Miami Police Department, namely (1) "that there had been 17 internal investigations at Miami PD over" officers using excessive force and other violations, (2) that "inappropriate things [had] been happening on [the midnight] shift for over ten years," (3) that the department's internal "investigations were not thorough and were more of a coverup than a real investigation," (4) "that there was weak and inappropriate supervision" of officers on the midnight shift, (5) that "the supervisors were as guilty of using excessive force as anyone else," and (6) "that because nothing happens to the violating officers, the general mood of the midnight shift is that everyone might as well go along with the inappropriate behavior as it ha[d] become the norm." [Dkt. #147-18, p. 4–12; Dkt #147-17].

- Statements by Officer Lashmet to ADA Ellis that she quit working the night shift because she was "tired of all the violence that occurs on every traffic stop" and that she once saw an officer "punch him [a suspect] to the point where he couldn't breathe." [Dkt. #148-10].

- Detective Dean's testimony that he never received any specific training as to what constitutes excessive force. [Dkt. #147-19, p. 3].

---

[12]  Payne also submits that Chief Haralson ratified Officer Lashmet's acts of malicious prosecution by failing to notify the district attorney about the material falsehoods in Officer Lashmet's probable cause affidavit. To prevail based on a ratification theory, Payne must show that Chief Haralson approved of Officer Lashmet's actions and the basis for them. *See Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009). Here, the evidence shows that Chief Haralson ordered an internal investigation into Officer Lashmet's conduct in connection with Payne's arrest. Further, there is no indication in the record that Chief Haralson knew that the district attorney office had not received a copy of the arrest video. Under these circumstances, a reasonable jury could not find that Chief Haralson had ratified Officer Lashmet's alleged acts of malicious prosecution.

The City of Miami contends that the statements of Officer Lashmet and Detectives Dean and Byfield are hearsay and thus should not be considered on summary judgment. "At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Thus, hearsay statements "that would be inadmissible at trial cannot be used to defeat a motion for summary judgment." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

The court starts with Officer Lashmet's statements to ADA Ellis. Payne seeks to prove these statements via a memo prepared by ADA Ellis. The memo involves two potential layers of hearsay. First, the memo recounts out-of-court statements that Officer Lashmet made to ADA Ellis; second, the memo is itself an out-of-court statement. The first layer of hearsay does not pose a bar to admissibility. At the time Officer Lashmet made these statements, she was an employee of the Miami Police Department. Because her statements concern matters within the scope of her employment, they are admissible against the City as opposing party statements under Federal Rule of Evidence 801(d)(2)(D). The second layer of hearsay, however, is not so easily overcome. Payne contends that ADA Ellis's memo is admissible under Rule 803(6) as a record of a regularly conducted activity. The record, however, lacks evidence of the foundational facts necessary to admit the memo under this exception. There, for example, is no indication in the record that this memo "was kept in the course of a regularly conducted activity," or that drafting such memos "was a regular practice of this activity." Fed. R. Evid. 803(6). Payne has not offered, nor has the court found, any other exception to the hearsay rule that would readily apply to the ADA Ellis's memo. The court, therefore, will not consider the memo for purposes of summary judgment.

This leaves the statements of Detectives Dean and Byfield.  Payne offers two forms of evidence to prove these statements:  (1) a memo prepared by ADA Loring, and (2) ADA Loring's deposition testimony.  For the reasons just discussed, ADA Loring's memo constitutes inadmissible hearsay and thus cannot be considered on summary judgment.  The same, however, cannot be said for the ADA's deposition testimony.  Like Officer Lashmet, Detectives Dean and Byfield made the statements at issue while employees of the Miami Police Department.  Because their statements concern matters within the scope of their employment, they are admissible against the City as opposing party statements under Rule 801(d)(2)(D).[13]  ADA Loring's account of these statements during his deposition testimony does not raise additional hearsay concerns and thus is admissible evidence of the detectives' statements for purposes of summary judgment.  The court, therefore, will consider the detectives' statements as described in the ADA Loring's deposition testimony.[14]

Turing to the merits, the remaining evidence, viewed in the light most favorable to Payne, is sufficient to raise a genuine issue of material fact as to each element of Payne's municipal liability claim.  A jury viewing this evidence could reasonably conclude that the use of excessive force within the Miami Police Department was so widespread as have the force of law, that this custom was the moving force behind Payne's injury, and that the City was deliberately

---

[13]  This is true regardless of whether the detectives "lacked personal knowledge of the matters asserted."  *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 667 (10th Cir. 2006).  Indeed, the Tenth Circuit has explained that "an admission of a party opponent needs no indicia of trustworthiness to be admitted."  *Id.*

[14]  At one point during his deposition testimony, ADA Loring testified that he could not specifically recall whether Detectives Dean and Byfield stated the following:  "[B]ecause nothing happens to the violating officers, the general mood of the midnight shift is that everyone might as well go along with the inappropriate behavior as it has become the norm."  [Dkt #147-18, p. 12].  ADA Loring did, however, testify that if he wrote this statement in his memo then the detectives said it. [*Id.*]  Under these circumstances, the court will consider this statement in ADA Loring's memo as a recorded recollection, admissible under Rule 803(5).

indifferent to this custom's known or obvious consequences.  Thus, the City of Miami is not
entitled to summary judgment on Payne's municipal liability claims.

### E.  Assault & Battery

The court next considers Payne's state law assault and battery claims against Trooper
McKee, Officer Myers, the City of Miami, and DPS.  In Oklahoma, an individual is liable for
battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the
other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact
with the person of the other directly or indirectly results."  *Brown v. Ford*, 905 P.2d 223, 229
n.34 (Okla. 1995) (overruled on other grounds) (quoting Restatement (Second) of Torts § 13).
Similarly, an individual is liable for assault if "(a) he acts intending to cause a harmful or
offensive contact with the person of the other or a third person, or an imminent apprehension of
such a contact, and (b) the other is thereby put in such imminent apprehension."  *Id.* (quoting
Restatement (Second) of Torts § 21).  Such claims, however, are subject to additional
requirements when asserted as against a police officer.  Under Okla. Stat. tit. 21, § 643(1), "an
action for assault and battery will not lie for the use of force 'when necessarily committed by a
public officer in the performance of any legal duty ….'"  *Madoux v. City of Norman*, No. CIV-
07-435-M, 2007 WL 4171558, at *5 (W.D. Okla. Nov. 20, 2007) (alteration omitted) (quoting
Okla. Stat. tit. 21, § 643(1)); *accord Jones v. Hacker*, No. 13-CV-00444-JHP, 2015 WL
1279363, at *11 (E.D. Okla. Mar. 20, 2015); *Thetford v. Hoehner*, No. 05-CV-0405-CVE-FHM,
2006 WL 964754, at *6 (N.D. Okla. Apr. 12, 2006).  An officer's use of force is not "necessarily
committed" where such force is excessive or unreasonable.  *See Thetford*, 2006 WL 964754, at
*6; *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dep't*, 230 P.3d 869, 879–80
(Okla. 2010).

Here, Trooper McKee contends that his seizure of Payne was lawful and that the force used was not excessive.  Similarly, Officer Myers argues that he did not intend to kick Payne in the face and that, in any event, Payne did not have enough time to experience imminent apprehension of a harmful contact.  As for the City and DPS, neither asserts that it is immune from the acts of assault and battery or excessive force committed by its officers; rather, each submits that its respective officer is not liable for assault and battery and thus that it likewise is not liable.

The defendants' arguments lack merit. Based on the video, a reasonable jury could find that Trooper McKee and Officer Myers each had committed all of the elements necessary for assault and battery.[15] Further, because genuine issues of fact exist as to whether Trooper McKee or Officer Myers used excessive force in connection with Payne's arrest, neither officer is entitled to summary judgment based on the protections afforded under Okla. Stat. tit. 21,

---

[15]  Officer Myers also contends that that he is immune from punitive damages on Payne's assault and battery claim because he was acting within the scope of his employment at the time of the arrest.  The court disagrees. For the reasons previously stated, a reasonable jury could find that Officer Myers intentionally and maliciously kicked Payne in the face.  The court, therefore, denies Officer Myer's motion for summary judgment on Payne's claim for punitive damages.

§ 643(1).[16]  This conclusion likewise precludes summary judgment for the City of Miami and DPS.[17]

### F.  Intentional Infliction of Emotional Distress

Payne next asserts a claim for intentional infliction of emotional distress ("IIED") against all defendants.  To sustain such a claim, Payne must prove, "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe."  *See Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008) (*quoting Computer Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002)).

As an initial matter, the City of Miami and DPS each submit that it cannot be held liable on an IIED claim based on Okla. Stat. tit. 51, § 153.  That provision shields the State and its political subdivisions from liability "for any act or omission of an employee acting outside the

---

[16]  Officer Myers further contends that he cannot be sued for assault and battery for his conduct in arresting Payne based on Okla. Stat. tit. 22, §§ 193 and 196.  Section 196(1) states, in relevant part, that "[a] peace officer may, without a warrant, arrest a person … [f]or a public offense, committed or attempted in the officer's presence."  Section 193 provides that "[i]f, after notice of intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest."

Officer Myers's reliance on these provisions is misplaced.  Neither statute permits an officer to use unreasonable or excessive force if to effect an arrest.  *See Mantooth v. Cleveland Cnty.*, No. CIV-09-159-HE, 2009 WL 5216916, at *4 (W.D. Okla. Dec. 30, 2009); *Carter v. State*, 507 P.2d 932, 934 (Okla. Crim. App. 1973).  Here, because a reasonable jury could find that Officer Myers used excessive force in connection with Payne's arrest, these provisions do entitle the officer to summary judgment.

[17]  DPS also maintains that it is entitled to summary judgment on Payne's assault and battery claim under Okla. Stat. tit. 51, § 155(30).  That section provides that "[t]he state or a political subdivision shall not be held liable if a loss or claim results from … [a]cts or omissions done in conformance with then current recognized standards."  Okla. Stat. tit. 51, § 155(30).  DPS contends that in this context the court should construe the term "current recognized standards" as equivalent to the legal standard for excessive force.

This argument lacks merit.  As previously mentioned, a genuine issue of material fact exists as to whether Trooper McKee used excessive force in connection with Payne's arrest.  Thus, DPS's interpretation of § 155(30), even if correct, would not entitle it to summary judgment.

scope of the employee's employment." Okla. Stat. tit. 51, § 153(A). "An act of the employee is not in the scope of employment if the employee acted maliciously or in bad faith." *Pellegrino v. State ex rel. Cameron Univ. ex rel. Bd. of Regents of State*, 63 P.3d 535, 537 (Okla. 2003). However, in order to prove his IIED claim, Payne must demonstrate that the employees' behavior was "outrageous," and Payne cannot meet this element if the employees were acting in good faith. *See McMullen v. City of Del City*, 920 P.2d 528, 531 (Okla. Civ. App. 1996);[18] *Hindman v. Thompson*, 557 F. Supp. 2d 1293, 1306-07 (N.D. Okla. 2008). Thus, the City and DPS are entitled summary judgment on Payne's IIED claim.

As for the remaining defendants, Trooper McKee and Officers Lashmet and Myers each contend that their conduct was not outrageous or extreme and thus that they are entitled to judgment as a matter of law. The court disagrees with respect to the arguments of Officers Lashmet and Myers. Here, the record contains evidence from which a reasonable jury could find that Officer Myers used excessive force by intentionally kicking Payne in the face. Further, the record contains evidence that Officer Lashmet intentionally fabricated information in her probable cause affidavit, thereby causing the State to prosecute Payne on baseless charges. Because reasonable minds could differ as to whether or not this conduct is sufficiently outrageous to support a claim for IIED, *see Allen v. Town of Colcord*, 874 F. Supp. 2d 1276, 1290 (N.D. Okla. 2012), Officer Lashmet and Myers' motions for summary judgment on Payne's IIED claim are denied. As for Trooper McKee, though a jury might find that the force used to arrest Payne was objectively unreasonable, the court concludes that a reasonable jury could not find the trooper's conduct sufficiently outrageous to support an IIED claim. Trooper McKee's motion for summary judgment on the IIED claim is granted.

---

[18] Pursuant to Oklahoma Supreme Court Rule 1.200(d)(2), an opinion released for publication by order of the Oklahoma Court of Appeals shall be considered to have persuasive effect.

### G. False Imprisonment

The court next considers Payne's state-law false imprisonment claim against the City of Miami and DPS.  As an initial matter, the court notes that it is unclear whether Payne wishes to maintain this claim as one for false imprisonment or false arrest.

> Although false arrest and false imprisonment are often used interchangeably, "there is a distinction in the manner in which causes of action for false arrest and false imprisonment arise …. in a false arrest, false imprisonment exists, but the detention is by reason of an asserted legal authority to enforce the processes of the law; in a false imprisonment, the detention is purely a matter between private persons for a private end, and there is no intention of bringing the person detained before a court, or of otherwise securing the administration of the law."

*Roberts v. Goodner's Wholesale Foods, Inc.*, 50 P.3d 1149, 1151 n.3 (Okla. Civ. App. 2002) (alteration in original) (quoting *McGlone v. Landreth*, 195 P.2d 268, 271 (Okla. 1948)).

In either event, Payne's claim lacks merit.  Here, the record clearly shows that the defendant-officers had probable cause to arrest Payne for speeding and that they arrested him in their capacity as law enforcement officers.  Because probable cause is a complete defense to a claim for false arrest, *see Walters v. J.C. Penney Co.*, 82 P.3d 578, 583 n.21 (Okla. 2003), and the record contains no evidence that the officers arrested Payne "for a private end," *Roberts*, 50 P.3d at 1151 n.3, Payne claim, whether considered as one for false arrest or false imprisonment, must fail.  Thus, the defendants' motions for summary judgment on Payne's false imprisonment claim are granted.

### H. Negligent Use of Excessive Force

Finally, the court considers Payne's negligent use of excessive force claims against the City of Miami and DPS.  In Oklahoma, "[a] defendant is generally said to owe a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks that make the conduct unreasonably dangerous."  *Morales*, 230 P.3d at 878.  Because, however, the act of making an arrest necessarily involves some risk of harm to the arrestee, "a police officer has a

special dispensation from the duty of ordinary care not to endanger others." *Id.* at 880. In particular, "[a] police officer's duty … is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest." *Id.*

The defendants attack Payne's claim on multiple fronts. First, both defendants contend that Oklahoma law does not recognize a cause of action for the negligent use of excessive force. Second, the defendants each assert that it is nonetheless immune from liability on this claim under Okla. Stat. tit. 51, § 155. In particular, the City maintains that it is immune under § 155(5) and (6), while DPS claims immunity under § 155(30).

As an initial matter, the court notes that the Oklahoma Supreme Court has indicated that an arrestee may maintain an action against a police officer, and by extension the officer's employer when the officer was acting within the scope of his employment, for "negligently injur[ing the arrestee] by using excessive force." *See Nail v. City of Henryetta*, 911 P.2d 914, 915–18 (Okla.1996); *see also Morales*, 230 P.3d at 878–80 (suggesting factors that may be considered in evaluating the objective reasonableness of an officer's use of force). The court, therefore, will not dismiss plaintiff's claim on this ground. As for the defendants' immunity arguments, none of the provisions of § 155 cited by the defendants purport to immunize the state or a political subdivision for the negligent use of excessive force by one of its officers.[19] Accordingly, the defendants' motions for summary judgment on Payne's negligent use of excessive force claims are denied.

---

[19] Exceptions 5 and 6 in § 155 of the Oklahoma Governmental Tort Claims Act do not apply to tortious acts of government servants in the daily implementation of policy. *State ex rel. Oklahoma Dep't of Pub. Safety v. Gurich*, 238 P.3d 1, 4 (Okla. 2010). Moreover, under Oklahoma law, an officer is not engaged in a "protective function" immunized under § 155(6) where he carries out an arrest as part of his general law enforcement activities. *Morales*, 230 P.3d at 876; *see also Samuel v. City of Broken Arrow*, 506 F. App'x 751, 756 (10th Cir. 2012).

<u>**Conclusion**</u>

WHEREFORE, the Motion for Summary Judgment of defendant the City of Miami, Oklahoma, [Dkt. #121] is granted in part and denied in part. The City's motion is granted with respect to plaintiff's false imprisonment and intentional infliction of emotional distress claims and denied as to plaintiff's remaining claims of municipal liability, assault and battery, and negligence.

The Motion for Summary Judgment of defendant Jeremy Myers [Dkt. #122] is granted in part and denied in part. Officer Myers's motion is granted with respect to plaintiff's wrongful arrest, malicious prosecution, and false imprisonment claims and denied as to plaintiff's remaining claims of excessive force, assault and battery, and intentional infliction of emotional distress. Officer Myers's motion is also denied as to Payne's claim for punitive damages.

The Motion for Summary Judgment of defendant Teresa Lashmet [Dkt. #127] is granted in part and denied in part. Officer Lashmet's motion is granted with respect to plaintiff's excessive force, wrongful arrest, malicious prosecution, false imprisonment, and assault and battery claims and denied as to plaintiff's remaining claim of intentional infliction of emotional distress.

The Motion for Summary Judgment of defendant Kenny McKee and the Department of Public Safety ("DPS") [Dkt. #128] is granted in part and denied in part. Trooper McKee's motion is granted with respect to plaintiff's wrongful arrest, malicious prosecution, intentional infliction of emotional distress, and false imprisonment claims and denied as to plaintiff's remaining claims of excessive force and assault and battery. DPS's motion is granted with respect to plaintiff's false imprisonment and intentional infliction of emotional distress claims and denied as to plaintiff's remaining claims of assault and battery and negligence.

IT IS SO ORDERED this 30th day of September, 2015.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT